**THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| PARUS HOLDINGS, INC.<br><br>v.<br><br>CHARLES SCHWAB & CO., INC. | §<br>§<br>§<br>§<br>§<br>§<br>§ | CASE NO. 2:21-CV-393-JRG |
| PARUS HOLDINGS, INC.<br><br>v.<br><br>BANK OF AMERICA, N.A., | §<br>§<br>§<br>§<br>§<br>§<br>§ | CASE NO. 2:21-CV-394-JRG |
| PARUS HOLDINGS, INC.<br><br>v.<br><br>CAPITAL ONE BANK (USA) NATIONAL ASSOCIATION | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CASE NO. 2:21-CV-395-JRG |
| PARUS HOLDINGS, INC.<br><br>v.<br><br>FMR LLC d/b/a FIDELITY INVESTMENTS, | §<br>§<br>§<br>§<br>§<br>§ | CASE NO. 2:21-CV-396-JRG |

**CLAIM CONSTRUCTION ORDER**

On February 26, 2024, the Court held a hearing to determine the proper construction of disputed terms in United States Patent No. 7,327,723. Before the Court are the Opening Claim Construction Brief (Dkt. No. 107) filed by Plaintiff Parus Holdings, Inc., the Responsive Claim Construction Brief (Dkt. No. 109) filed by Defendants Charles Schwab & Co., Inc., Bank of America, N.A., Capital One Bank (USA) National Association ("Capital One"), and FMR LLC

d/b/a Fidelity Investments ("Fidelity") (collectively, "Defendants"), Plaintiff's Reply Claim Construction Brief (Dkt. No. 111), the parties' July 20, 2022 Patent Rule 4-3 Joint Claim Construction and Prehearing Statement (Dkt. No. 91), and the parties' September 28, 2022 Patent Rule 4-5(d) Joint Claim Construction Chart (Dkt. No. 113).

Also before the Court are the parties' December 19, 2023 Patent Rule 4-3 Joint Claim Construction and Prehearing Statement (Dkt. No. 91), Plaintiff's Supplemental Opening Claim Construction Brief (Dkt. No. 136), Capital One and Fidelity's Supplemental Responsive Claim Construction Brief (Dkt. No. 137), Plaintiff's Reply to Defendants' Supplemental Responsive Claim Construction Brief (Dkt. No. 138), and the parties' January 26, 2024 Updated P.R. 4-5(d) Joint Claim Construction Chart (Dkt. No. 141).

Having reviewed the arguments made by the parties at the hearing and in their claim construction briefing, having considered the intrinsic evidence, and having made subsidiary factual findings about the extrinsic evidence, the Court hereby issues this Claim Construction Order. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (*en banc*); *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015).

Table of Contents

**I. BACKGROUND** ........ **3**
**II. LEGAL PRINCIPLES** ........ **4**
**III. AGREED TERMS** ........ **7**
**IV. DISPUTED TERMS** ........ **8**
A. "[a] speaker-independent speech recognition device" ........ 8
B. "natural voice commands" ........ 20
C. "[at least one] set of stored commands" ........ 28
D. "[alternative] intuitive description" ........ 32
E. "voice server" ........ 42
F. "tag" ........ 45
G. "said voice command comprises said voice-enabled function and a tag" ........ 48
H. "logic flow" ........ 52
**V. CONCLUSION** ........ **58**

## I. BACKGROUND

Plaintiff alleges infringement of United States Patent No. 7,327,723 ("the '723 Patent") (Dkt. No. 107, Ex. A). The '723 Patent, titled "Computer, Internet and Telecommunications Based Network," issued on February 5, 2008, and bears an earliest priority date of March 3, 1997. Plaintiff submits that the invention relates to "a technological solution that allowed natural, intuitive voice commands and speaker-independent speech technology to access a communications system over a standard telephone connection." Dkt. No. 107 at 3. Relevant systems are sometimes referred to as Interactive Voice Response (IVR) systems.

The Abstract of the '723 Patent states:

> A method and apparatus for a computer and telecommunication network which can receive, send and manage information from or to a subscriber of the network, based on the subscriber's configuration. The network is made up of at least one cluster containing voice servers which allow for telephony, speech recognition, text-to-speech and conferencing functions, and is accessible by the subscriber through standard telephone connections or through internet connections. The

> network also utilizes a database and file server allowing the subscriber to maintain and manage certain contact lists and administrative information. A web server is also connected to the cluster thereby allowing access to all functions through internet connections.

After the parties submitted claim construction briefs to the Court, the parties filed a Joint Motion to Stay Pending *Ex Parte* Reexamination of United States Patent 7,327,723, which the Court granted. *See* Dkt. Nos. 122, 127 & 128. The United States Patent and Trademark Office ("PTO") confirmed the patentability of all of the claims of the '723 Patent and issued a reexamination certificate on September 8, 2023. The parties have addressed this *ex parte* reexamination in their supplemental claim construction briefing. *See* Dkt. Nos. 136, 137 & 138.

Shortly before the start of the February 26, 2024 hearing, the Court provided the parties with preliminary constructions with the aim of focusing the parties' arguments and facilitating discussion. Those preliminary constructions are noted below within the discussion for each term.

## II. LEGAL PRINCIPLES

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips*, 415 F.3d at 1312 (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). Claim construction is clearly an issue of law for the court to decide. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970–71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). "In some cases, however, the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva*, 135 S. Ct. at 841 (citation omitted). "In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence. These are the

'evidentiary underpinnings' of claim construction that we discussed in *Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal." *Id.* (citing 517 U.S. 370).

To determine the meaning of the claims, courts start by considering the intrinsic evidence. *See Phillips*, 415 F.3d at 1313; *see also C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *See Phillips*, 415 F.3d at 1314; *C.R. Bard*, 388 F.3d at 861. Courts give claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the entire patent. *Phillips*, 415 F.3d at 1312–13; *accord Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

The claims themselves provide substantial guidance in determining the meaning of particular claim terms. *Phillips*, 415 F.3d at 1314. First, a term's context in the asserted claim can be very instructive. *Id.* Other asserted or unasserted claims can aid in determining the claim's meaning because claim terms are typically used consistently throughout the patent. *Id.* Differences among the claim terms can also assist in understanding a term's meaning. *Id.* For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id.* at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id.* at 1315 (quoting *Markman*, 52 F.3d at 979). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Phillips*, 415 F.3d at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *accord Teleflex, Inc. v. Ficosa N. Am.*

*Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope. *Phillips*, 415 F.3d at 1316. In these situations, the inventor's lexicography governs. *Id.* The specification may also resolve the meaning of ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex*, 299 F.3d at 1325. But, "[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims." *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *accord Phillips*, 415 F.3d at 1323.

The prosecution history is another tool to supply the proper context for claim construction because a patent applicant may also define a term in prosecuting the patent. *Home Diagnostics, Inc. v. Lifescan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent."). "[T]he prosecution history (or file wrapper) limits the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance." *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985).

Although extrinsic evidence can be useful, it is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Phillips*, 415 F.3d at 1317 (citations and internal quotation marks omitted). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too

broad or may not be indicative of how the term is used in the patent. *Id.* at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are entirely unhelpful to a court. *Id.* Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.*

The Supreme Court of the United States has "read [35 U.S.C.] § 112, ¶ 2 to require that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014). "A determination of claim indefiniteness is a legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005) (citations and internal quotation marks omitted), *abrogated on other grounds by Nautilus,* 134 S. Ct. 2120. "Indefiniteness must be proven by clear and convincing evidence." *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017).

## III. AGREED TERMS

In their December 19, 2023 Patent Rule 4-3 Joint Claim Construction and Prehearing Statement, the parties submitted that "[t]he parties have been unable to agree on any constructions at this time." (Dkt. No. 135 at 2.)

## IV. DISPUTED TERMS

### A. "[a] speaker-independent speech recognition device"

| **"[a] speaker-independent speech recognition device"** (Claims 1, 17–18, 22, 31–34, 42–44) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| "a device that receives natural voice commands and converts speech to text using phonemes in the natural voice command and that does not have to be trained to recognize a user's speech"[1] | "a Dialogic Antares card that uses Purespeech software in order to perform speaker-independent speech recognition"<br><br>In the alternative, indefinite under 35 U.S.C. § 112[2] |
| **"speaker-independent speech recognition"** (Claims 1, 17–18, 22, 31–34, 42–44) | |
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| *See* "speaker-independent speech recognition device" | "speech recognition that uses phenomes [*sic*, phonemes] to recognize speech, without any training or use of predefined voice patterns" |

Dkt. No. 135 at 2; Dkt. No. 137 at 7.

Shortly before the start of the February 26, 2024 hearing, the Court provided the parties with the following preliminary constructions: "a speech recognition device that uses phonemes and PureSpeech algorithms to convert speech to text and that does not have to be trained to recognize a specific user's speech"; and "speech recognition that uses phonemes and PureSpeech

---

[1] Plaintiff previously proposed: "Plain and ordinary meaning: 'a speech recognition device that does not have to be trained to recognize a user's speech.'" Dkt. No. 91 at 2; Dkt. No. 107 at 14.

[2] Defendants previously proposed: "'a digital signal processing device configured to perform phonemes-based speech recognition to recognize human speech without prior training by a specific user' / Alternatively: 'a Dialogic Antares card that uses Purespeech software in order to perform phonemes-based speech recognition.'" Dkt. No. 91 at 2; Dkt. No. 109 at 13.

algorithms to convert speech to text and that does not have to be trained to recognize a specific user's speech."

(1) The Parties' Positions

The parties' original arguments (*see* Dkt. No. 107 at 15–17; *see also* Dkt. No. 109 at 14–17; Dkt. No. 111 at 1–3) have been essentially superseded by their supplemental briefing.

In supplemental briefing, Plaintiff submits that during reexamination the PTO construed these terms, based on the specification (as well as based on extrinsic evidence), as referring to "converting the speech to text, using the phonemes in the natural voice command." Dkt. No. 136 at 7. Plaintiff argues that the PTO's construction is entitled to deference and should be adopted here. *Id.* at 9. Plaintiff argues that Defendants' proposed construction should be rejected because "[t]here is no mention at all by the [reexamination] panel that they considered a 'speaker-independent speech recognition device' to be limited to any particular structure, let alone 'a Dialogic Antares card that uses Purespeech software.'" *Id.* at 10. Plaintiff submits that "Defendants are attempting to have the claims construed broadly for invalidity purposes (plain and ordinary meaning) and narrowly for infringement purposes (a Dialogic Antares card that uses Purespeech software) . . . ." *Id.* Further, Plaintiff argues that Defendants' proposed construction for the term "speaker-independent speech recognition" is inconsistent with the PTO's construction. *Id.* Finally, as to Defendants' assertion of indefiniteness, Plaintiff argues that Defendants cannot meet their burden, and "[h]aving previously contended that 'speaker-independent speech recognition device' has a definite meaning, Defendants cannot now change course and contend that the same term is now indefinite." *Id.* at 11.

Defendants respond that, during reexamination, Plaintiff "abandoned i[t]s position in this litigation with respect to '[a] speaker-independent speech recognition device,' and *adopted*

Defendants' construction that limited this claim term to PureSpeech and its algorithms and the required Dialogic Antares card for the digital signal processor." Dkt. No. 137 at 1; *see id.* at 8. In particular, Defendants argue that "[i]n arguing that the speech recognition device of the '723 patent was limited to PureSpeech, Parus also introduced materials showing that PureSpeech ran on Dialogic Antares cards." *Id.* at 9 (citations omitted). Finally, Defendants argue that "[i]n the reexamination . . ., Parus argued that the '723 patent disclaims all but a specific type of speaker-independent speech recognition: one that is phonemes-based, that does not use any voice patterns, templates, or training from a large dataset of samples." *Id.* at 10 (citations omitted).

Plaintiff replies that "although the Reexam Panel considered all of the statements relied on by Defendants, the Panel did *not* limit its construction to 'a Dialogic Antares card that uses PureSpeech software.'" Dkt. No. 138 at 6.

At the February 26, 2024 hearing, the parties presented oral arguments as to this term.

(2) Analysis

As a threshold matter, Defendants argue that, as to the recent reexamination proceedings, "[t]he Court should give no weight to the examiner's constructions because they were the direct result of Parus's lack of candor in withholding its litigation positions." Dkt. No. 137 at 1. But even though Plaintiff's claim construction positions became known only after petitioner [24]7.ai, Inc. petitioned for reexamination, Defendants' argument is at least somewhat undercut by petitioner [24]7.ai, Inc being Defendants' indemnitor. *See* Dkt. No. 138 8 n.2. Also, even accepting Defendants' position that the Plaintiff was obligated, during reexamination, to disclose any prior claim constructions, Defendants have not shown that this duty extends to claim constructions that were merely proposed.

Turning to the claim language, Claim 42 for example recites (emphasis added):

> 42. A voice-enabled system for managing communications transmitted through a network, said system capable of receiving natural voice commands from a user, said system comprising:
>
> a computer;
>
> at least one set of stored commands operatively associated with said computer, each said set including a plurality of stored commands each of said commands in said set corresponding to a single voice-enabled function for managing communications, each said command in said set being an alternative intuitive description of said single voice-enabled function;
>
> a voice server operatively connect[ed] to said computer and to said network, said voice server configured to compare said natural voice commands to said plurality of stored commands;
>
> *a speaker-independent speech recognition device* operatively connected to said voice server, said device configured to receive at least one natural voice command, said voice command comprising said voice-enabled function and a tag, said tag associated with contact information stored in a database, said database associated with said computer, said voice server being configured to compare said natural voice command to said plurality of stored commands to select said single voice-enabled function, and said computer being configured to execute said selected voice-enabled function corresponding to said natural voice command.

The specification discloses:

> The system provides three ways for the subscriber to handle his communications. First and foremost is the *voice recognition software* using *natural voice recognition (phonemes based)*, not pattern based as many of the current systems utilize. Therefore, the system *does not have to be trained to identify your voice.*

'723 Patent at 5:6–11 (emphasis added).

In their supplemental claim construction briefing, both sides now propose that the disputed terms require using "phonemes." Dkt. No. 136 at 7–9; Dkt. No. 137 at 2 & 10.

As to whether the term "speaker-independent speech recognition *device*" should be limited to a "Dialogic Antares card," Defendants emphasize a portion of the specification that refers to "[t]he present invention":

> *The present invention is* a compilation of hardware and software, including voice processing using Dialogic's SCSA extended bus and board-level resources, *Purespeech speech recognition running on Dialogic Antares boards*, and database management using Sybase System 10 and 11. Further, the system utilizes data networking, particularly TCP/IP and distributed systems, object-oriented design and programming, multi-processing with Intel hardware, SCO UNIX and Solaris

> operation systems, Java and JavaScript languages, US and international long distance protocols, internet and web protocols, credit and payment processing, a help desk, customer service system, and network and service management.
>
> For the voice and fax processing servers, the system relies on *Dialogic hardware, including*, voice boards, *Antares cards* (for speech recognition and fax) and digital switching cards. The system also uses the SCSA extended bus. *The Purespeech ASR algorithms, which are used for speech recognition, run on the Antares cards* plugged into the computers running the Solaris OS.

’723 Patent at 6:4–23 (emphasis added).

In some cases, “[w]hen a patent . . . describes the features of the ‘present invention’ as a whole, this description limits the scope of the invention.” *Forest Labs., LLC v. Sigmapharm Labs., LLC*, 918 F.3d 928, 933 (Fed. Cir. 2019) (quoting *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007). Also, Defendants’ expert cites this disclosure and opines that the speech recognition device requires a digital signal processing hardware card to filter and compress an analog voice signal into a digital signal that could be processed by the speech recognizer. Dkt. No. 109, Ex. 1, July 20, 2022 Zatkovich Decl. at ¶¶ 42–44. Without such a device, Defendants’ expert opines, phonemes-based speech recognition could not be performed. *Id.*

A fair reading of this disclosure, however, is that the patentee referred to the “present invention” as being a compilation of hardware and software and that an *example* of such a compilation is “Dialogic’s SCSA extended bus and board-level resources, Purespeech speech recognition running on Dialogic Antares boards, and database management using Sybase System 10 and 11.” ’723 Patent at 6:4–23. Such a reading is reinforced by the location in which this disclosure appears, in the “Detailed Description of the Preferred Embodiments.” *See C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 864 (Fed. Cir. 2004) (“Statements that describe the invention as a whole, rather than statements that describe only preferred embodiments, are more

likely to support a limiting definition of a claim term. Statements that describe the invention as a whole are more likely to be found in certain sections of the specification, such as the Summary of the Invention.") (citations omitted).

Also, as reproduced above, the specification refers more generally to "voice recognition software using natural voice recognition." '723 Patent at 5:7–8. Although software inherently must run on hardware, this disclosure does not express or imply any specific or special-purpose hardware requirement.

The October 11, 1996 Dialogic press release cited by Defendants—stating that "[t]he Antares platform is the only DSP board on which the PureSpeech ASR package can be purchased and used today"—is extrinsic evidence that does not warrant importing a narrow limitation. Dkt. No. 137 at Ex. 3.

Defendants also cite statements by named inventor Alex Kurganov in *Parus Holdings, Inc. v. Sallie Mae Bank*, 1:14-CV-1427-SLR (D. Del.), in opposition to a motion to dismiss, stating:

> 9. The patents disclose the use of phonemes-based speech recognition, rather than the prior systems' pattern-based speech recognition. Phoneme-based speech recognition systems do not need to be trained by a user, and are therefore referred to as "speaker-independent."
>
> * * *
>
> 14. The specification identifies speech-recognition tools such as Dialogic Antares hardware cards and Purespeech algorithms, and those skilled in the art understand that those are not generic, off-the-shelf computer components.
>
> 15. Those skilled in the art understand that Antares cards are special-purpose Digital Signal Processing hardware cards that have to be interfaced and integrated into the system with extensive software applications to operate.
>
> 16. Those skilled in the art understand that Purespeech is a speech-recognition engine that runs on the Digital Signal Processing hardware.

Dkt. No. 109, Ex. 8, Feb. 12, 2015 Kurganov Decl. at ¶¶ 9 & 14–16.[3]

Defendants cite authority that "[a]n inventor is a competent witness to explain the invention and what was intended to be conveyed by the specification and covered by the claims." *See Voice Techs. Grp., Inc. v. VMC Sys., Inc.*, 164 F.3d 605, 615 (Fed. Cir. 1999). More recently, however, the Court of Appeals for the Federal Circuit has stated that "inventor testimony as to the inventor's subjective intent is irrelevant to the issue of claim construction." *Howmedica Osteonics Corp. v. Wright Med. Tech., Inc.*, 540 F.3d 1337, 1347 (Fed. Cir. 2008). Based on *Howmedica*, relying on the named inventor's opinions would be disfavored.

Defendants also cite authority regarding collateral estoppel. *See A.B. Dick Co. v. Burroughs Corp.*, 713 F.2d 700, 704 (Fed. Cir. 1983). Defendants do not show, however, that the present case involves a claim scope issue that is identical to any claim scope issue that was essential to the determination in *Sallie Mae*. Indeed, the *A.B. Dick* case cited by Defendants itself applied the doctrine of collateral estoppel narrowly. *See id.*

As to the examiner's findings in the recent reexamination proceedings, Plaintiff proposes adopting the examiner's finding that speaker-independent speech recognition necessarily involves converting speech to text. The examiner noted that "[a]ccording to the Patent Owner's extrinsic evidence, ASR algorithms required converting the speech to text as an initial step." Dkt. No. 136, Ex. I, Aug. 8, 2023 Notice of Intent to Issue Ex Parte Reexamination Certificate at 8 (citation omitted). Also, as to Defendants' proposal of requiring "Purespeech software," Plaintiff's expert in the recent reexamination proceedings opined: "[T]he speaker-independent speech recognition device as required by the claims of the '723 Patent . . . uses 'Purespeech

[3] Ultimately, the District of Delaware found that the patent claims there at issue were directed to ineligible subject matter. 137 F. Supp. 3d 660 (D. Del. 2015) (involving four patents related to the '723 Patent).

speech recognition' that recognizes phonemes in natural voice commands by converting speech to text and then co-relating the converted text to recognition grammars." Dkt. No. 136, Ex. P, Jan. 30, 2023 Occhiogrosso Decl. at ¶ 13.

Subsequently, in responding to the April 4, 2023 Second Office Action during the recent reexamination, the patentee relied on converting speech to text when distinguishing the "Borcherding" reference:

> *The proper construction* [according to the principles of claim construction set forth in *Phillips*] based on intrinsic evidence in the specification of the '723 Patent (including the entire source code provided with the provisional application) is that natural voice commands are phoneme-based commands recognizable by a two-part process used by *PureSpeech* and its superior algorithms that can discern the difference between similar sounding words.
>
> The *speaker-independent speech recognition device (PureSpeech and its algorithms) of the '723 Patent* performs speech recognition by *converting speech to text (from phonemes in the natural voice commands) and using the text (as generated from the phonemes)* to select the appropriate recognition grammar. The '723 Patent *uses the translated text and attempts to match the translated text* with recognition grammars (the alternative intuitive descriptions) that correspond to potential capabilities of the system.

Dkt. No. 136, Ex. Q, June 5, 2023 Second Response in Ex Parte Reexamination at 31 (emphasis added). These statements can be considered. *Krippelz v. Ford Motor Co.*, 667 F.3d 1261, 1266 (Fed. Cir. 2012) ("A patentee's statements during reexamination can be considered during claim construction, in keeping with the doctrine of prosecution disclaimer.").

The patentee thus definitively stated that a "speaker-independent speech recognition device" converts speech to text and uses PureSpeech algorithms to do so, and these statements should be given effect in the Court's construction. *See, e.g., Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995) ("Claims may not be construed one way in order to obtain their allowance and in a different way against accused infringers."); *Omega Eng'g Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003) ("prosecution disclaimer promotes the

public notice function of the intrinsic evidence and protects the public's reliance on definitive statements made during prosecution").

The remaining question is whether these definitive statements are neutralized by any subsequent proceedings in reexamination.

On one hand, the examiner did not expressly refer to the patentee's reliance on PureSpeech, and "[c]ourts have refused to find a disclaimer was made when the purported disclaimer was rejected by the patent office." *Vertical Tank, Inc. v. BakerCorp*, No. 1:18-CV-145-LJO-JLT, 2019 WL 2207668, at *11–*12 (E.D. Cal. May 22, 2019) (citing decisions across four different districts).

On the other hand, the examiner approvingly cited Plaintiff's position. In the examiner's words, "the claimed speech recognition device and voice server which perform the functions of receiving a natural language voice command and comparing the natural voice command to a set of stored commands in order to select a voice enabled function, require a first step of converting the speech to text, using the phonemes in the natural language voice command, and a second step of using the text, generated from the phonemes, to select the voice enabled function." Dkt. No. 136, Ex. I, Aug. 8, 2023 Notice of Intent to Issue Ex Parte Reexamination Certificate at 6.

The examiner further stated that "[t]he specification discloses the claimed speech recognition is based on phonemes and specifically disclaims pattern-based methods," and "the Examiner finds the speech recognition is described as using an automatic speech recognition (ASR) algorithm." *Id.* at 8 (citing '723 Patent at 3:37–41, 5:6–11, 5:52–55 & 6:17–23).

On balance, the absence of any explicit statement by the examiner regarding reliance on PureSpeech does not preclude Plaintiff's statements from being limiting. No rejection of the patentee's statement is apparent. *See Abbott Labs. & Surmodics, Inc. v. Church & Dwight Co.,*

*Inc.*, No. 07 C 3428, 2008 WL 5387848, at *8 (N.D. Ill. Dec. 22, 2008) ("Finding disclaimer based on statements ignored by a patent examiner is not . . . the same as finding disclaimer based on a proposed claim construction that the PTO expressly rejected.") (discussing *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1349–50 (Fed. Cir. 2004)).

Moreover, the examiner's findings provide good reason to conclude that the examiner relied on Plaintiff's statements regarding PureSpeech, at least implicitly. The examiner "f[ound] the speech recognition is described as using an automatic speech recognition (ASR) algorithm." Dkt. No. 136, Ex. I, Aug. 8, 2023 Notice of Intent to Issue Ex Parte Reexamination Certificate at 8 (citing '723 Patent at 3:37–41 & 6:17–23). The second portion of the specification cited by the examiner states:

> For the voice and fax processing servers, the system relies on Dialogic hardware, including, voice boards, Antares cards (for speech recognition and fax) and digital switching cards. The system also uses the SCSA extended bus. The *Purespeech ASR* algorithms, which are used for speech recognition, run on the Antares cards plugged into the computers running the Solaris OS.

'723 Patent at 6:17–23 (emphasis added).

The patentee's explicit reliance on PureSpeech during reexamination, particularly when considering that the examiner then referred to "ASR" and relied on disclosure in the specification regarding "PureSpeech ASR," *id.*, should be given effect in the Court's construction. *See Southwall*, 54 F.3d at 1576; *Omega Eng'g*, 334 F.3d at 1324.

At the February 26, 2024 hearing, Plaintiff submitted that it had no objection to the Court's preliminary constructions so long as "PureSpeech" is understood as referring to the two-step process used by PureSpeech rather than a specific PureSpeech product. Defendants responded that, in the recent reexamination proceedings, Plaintiff and the examiner referred to "PureSpeech" as a particular product rather than as a generic process. Defendants also

maintained that the claimed voice recognition requires analog-to-digital conversion, and Defendants argued that the disclosed Dialogic Antares card is necessary to be able to perform analog-to-digital conversion.

As discussed above, Plaintiff expressly relied on "PureSpeech," and the examiner in turn relied on PureSpeech algorithms as well. Dkt. No. 136, Ex. I, Aug. 8, 2023 Notice of Intent to Issue Ex Parte Reexamination Certificate at 8 (citing '723 Patent at 3:37–41 & 6:17–23); Dkt. No. 136, Ex. Q, June 5, 2023 Second Response in Ex Parte Reexamination at 31. In particular, Plaintiff relied on the "two-part process used by PureSpeech and its superior algorithms." *Id.* Likewise, in distinguishing the "FlexWord" reference, Plaintiff similarly referred to "PureSpeech's advanced capabilities." *Id.* at 9. A fair reading of these references to "its superior algorithms" and "advanced capabilities" is that Plaintiff referred to "PureSpeech" not just as an example of the "two-part process." Rather, Plaintiff relied upon the particular algorithms used by PureSpeech.

Thus, although Plaintiff did not rely upon a specific product, Plaintiff referenced and relied upon *the specific algorithms used by* the PureSpeech product. The constructions of the disputed terms should therefore be limited to the PureSpeech algorithms.

As to any remaining disputes regarding the content and contours of the PureSpeech algorithms, any such disputes pertain to factual issues regarding infringement rather than any legal question for claim construction. *See PPG Indus. v. Guardian Indus. Corp.*, 156 F.3d 1351, 1355 (Fed. Cir. 1998) ("after the court has defined the claim with whatever specificity and precision is warranted by the language of the claim and the evidence bearing on the proper construction, the task of determining whether the construed claim reads on the accused product is for the finder of fact"); *see also Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 806 (Fed. Cir.

2007) ("[t]he resolution of some line-drawing problems . . . is properly left to the trier of fact") (citing *PPG*, 156 F.3d at 1355); *Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.*, 815 F.3d 1314, 1318–19 (Fed. Cir. 2016) (citing *PPG*, 156 F.3d at 1355; citing *Acumed*, 483 F.3d at 806).

As to the specific physical hardware proposed by Defendants—the Dialogic Antares card—Defendants do not show any similar reliance or disclaimer by Plaintiff. Defendant's proposal of limiting these disputed terms so as to require a Dialogic Antares card is rejected.

The Court accordingly hereby construes these disputed terms as set forth in the following chart:

| Term | Construction |
|---|---|
| **"[a] speaker-independent speech recognition device"** | **"a speech recognition device that uses phonemes and PureSpeech algorithms to convert speech to text and that does not have to be trained to recognize a specific user's speech"** |
| **"speaker-independent speech recognition"** | **"speech recognition that uses phonemes and PureSpeech algorithms to convert speech to text and that does not have to be trained to recognize a specific user's speech"** |

**B. "natural voice commands"**

| **"natural voice commands"** (Claims 1, 17–18, 22, 31–34, 42–44) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain and ordinary meaning: "continuous speech freely spoken by a user which is not limited to a predefined set of words or a wordlist thereby eliminating the need for the user to utter specific words or phrases"[4] | Indefinite, 35 U.S.C. § 112<br><br>Alternatively, "a word or phrase spoken by a human."[5] |

Dkt. No. 136 at 3.

Shortly before the start of the February 26, 2024 hearing, the Court provided the parties with the following preliminary construction: "words or phrases spoken by a human that correspond to a function, wherein more than one word or phrase can correspond to a particular function."

(1) The Parties' Positions

The parties' original arguments (*see* Dkt. No. 107 at 19; *see also* Dkt. No. 109 at 18–19; Dkt. No. 111 at 3) have been essentially superseded by their supplemental briefing.

In supplemental briefing, Plaintiff submits that during reexamination the PTO construed this term based on the specification, as well as considering extrinsic evidence in the form of prior art patents, to mean "continuous speech freely spoken by a user which is not limited to a predefined set of words or a wordlist thereby eliminating the need for the user to utter specific words or phrases." Dkt. No. 136 at 4. Plaintiff argues that the PTO's construction is entitled to

[4] Plaintiff previously proposed: "Plain and ordinary meaning: 'words or phrases naturally spoken by a human.'" Dkt. No. 91 at 2; Dkt. No. 107 at 17.

[5] Defendants previously proposed: "'a word or phrase spoken by a human' / Alternatively: 'words or phrases spoken by a human.'" Dkt. No. 91 at 2; Dkt. No. 109 at 18.

deference and should be adopted here. *Id.* at 5. Plaintiff also argues that Defendants' assertion of indefiniteness should be rejected because Defendants cannot meet their burden, and "[h]aving previously contended that 'natural voice commands' has a definite meaning, Defendants now change course and contend that the term 'natural voice commands' is indefinite, despite having understood the term in the reexamination request and despite the [Reexamination] Panel having understood the meaning of the term." *Id.* at 6. Finally, Plaintiff argues that Defendants' alternative proposed construction should be rejected because it "ignore[s] the [PTO's] plain and ordinary construction for 'natural voice commands' based on the *Phillips* standard." *Id.* at 7.

Defendants respond that during reexamination Plaintiff argued that the "natural voice commands" of the '723 Patent must be intuitive to the user, and "[i]f a 'natural voice command' is only 'natural' if the command is intuitive to a user, then 'natural voice command' is indefinite . . . ." Dkt. No. 137 at 13. Defendants also argue: "Because, according to Parus, the 'natural voice command' must be intuitive to the user's intent, the computer itself must also understand the user's intuition in order for the natural voice command to 'instruct' the computer." *Id.* at 14. Further, Defendants argue that the reexamination construction gives rise to an inconsistency with dependent Claim 2. *Id.*

Plaintiff replies that the panel of examiners in reexamination had no difficulty understanding this claim term and that there is no inconsistency in dependent Claim 2. Dkt. No. 138 at 4.

At the February 26, 2024 hearing, the parties presented no separate oral arguments as to this term.

<u>(2) Analysis</u>

Claim 42, for example, recites (emphasis added):

> 42. A voice-enabled system for managing communications transmitted through a network, said system capable of receiving *natural voice commands* from a user, said system comprising:
>
> a computer;
>
> at least one set of stored commands operatively associated with said computer, each said set including a plurality of stored commands each of said commands in said set corresponding to a single voice-enabled function for managing communications, each said command in said set being an alternative intuitive description of said single voice-enabled function;
>
> a voice server operatively connect[ed] to said computer and to said network, said voice server configured to compare said *natural voice commands* to said plurality of stored commands;
>
> a speaker-independent speech recognition device operatively connected to said voice server, said device configured to receive at least one *natural voice command*, said voice command comprising said voice-enabled function and a tag, said tag associated with contact information stored in a database, said database associated with said computer, said voice server being configured to compare said *natural voice command* to said plurality of stored commands to select said single voice-enabled function, and said computer being configured to execute said selected voice-enabled function corresponding to said *natural voice command*.

The word "natural" appears in only one instance in the specification (other than in the claims):

> The system provides three ways for the subscriber to handle his communications. First and foremost is the voice recognition software using *natural* voice recognition (phonemes based), not pattern based as many of the current systems utilize. Therefore, the system does not have to be trained to identify your voice.

'723 Patent at 5:6–11 (emphasis added).

During prosecution, the patentee distinguished the "Bareis" reference (United States Patent No. 5,659,597), arguing:

> U.S. Patent No. 5,659,597 to Bareis et al. ("the Bareis Patent") does not disclose "at least one set of stored commands operatively associated with said computer, each said set including a plurality of stored commands each of said commands in said set corresponding to a single voice-enabled function for managing communications, each said command in said set being an alternative intuitive description of said single voice-enabled function." Rather, the system of the Bareis Patent only works with one specific voice command for a particular function and will not recognize other alternative commands that intuitively describe the same function.

> The system of the Bareis Patent only recognizes the specific voice commands "CALL," "DIAL," "DIRECTORY," or "QUIT," as described in the specification: * * *
>
> The system generates an error message if the user provides the system with a command other than "CALL," "DIAL," "DIRECTORY," or "QUIT," as described in the specification: * * *
>
> . . . In other words, if a user desires to make a telephone call, the system only will make the call if the user utters the specific command "CALL." The system will not work if the user utters the command "CONTACT" "MAKE A TELEPHONE CALL," or *other commands that intuitively describe the desired function* of making a call.
>
> The system disclosed in the Bareis Patent suffers from a severe deficiency because the user must have prior knowledge of the specific voice commands in order to interact with the system. In other words, users must memorize or have a listing of the *limited commands* which the system recognizes and *cannot speak naturally* with the system using one of a variety of commands which intuitively describes a desired voice-enabled function, as claimed in claims 13–56.

Dkt. No. 107, Ex. B, May 16, 2007 Amendment and Reply Under 37 CFR 1.114 at 14–15 (emphasis added).

In the recent reexamination proceedings, the examiner approvingly cited Plaintiff's position that, in the examiner's words, "the claimed natural voice commands requires [*sic*] the natural voice commands to comprise continuous speech freely spoken by a user which is not limited to a predefined set of words or a wordlist eliminating the need for the user to utter specific words or phrases." Dkt. No. 136, Ex. I, Aug. 8, 2023 Notice of Intent to Issue Ex Parte Reexamination Certificate at 6; *see id.* at 10 (noting that speech can be "continuous" in the sense of including "extraneous words or phrases" that the system can ignore, *see id.* at 10–11).

The usage of "natural" to describe a relatively wide range of what may be recognized by the system is consistent with the context in which "natural" appears in the claims. For example, dependent Claim 2 recites numerous variations of commands, which facilitate a user speaking naturally (rather than speaking only a strictly limited set of voice commands that have a one-to-

one correspondence with functions). Defendants' argument that "the determination whether a command is 'naturally spoken' is entirely subjective" is therefore unavailing. *Id.* at 21.

Also, Defendants' expert opines that "the word 'natural' refers to the fact that the commands originate from a human," but the opinion of Defendants' expert in this regard lacks support and is unpersuasive. Dkt. No. 109, Ex. 1, July 20, 2022 Zatkovich Decl. at ¶ 49 ("A POSITA would have recognized that the plain and ordinary meaning of the word 'natural' refers to the fact that the commands originate from a human. In my opinion, this understanding is consistent with a plain reading of the claim language."). Defendants cite disclosure in the specification regarding text-to-speech, such as that "[t]he system also utilizes text-to-speech so you can listen to your e-mail over the phone, or the subscriber can display his e-mail on his computer where he can reply and send email to his contacts with audio . . . ." '723 Patent at 5:40–43; *see id.* at 3:37–41 ("text-to-speech"). Defendants' expert opines that "a POSITA would have understood text-to-speech, as disclosed in the '723 Patent, is not a natural phenomenon." Dkt. No. 109, Ex. 1, July 20, 2022 Zatkovich Decl. at ¶ 51. The fact that text-to-speech is not a "natural" phenomenon does not, however, warrant any finding that "voice" as used in the '723 Patent encompasses text-to-speech.

Rather, as discussed above, the word "natural" relates to the relatively wide range of commands that the system can recognize, and Plaintiff persuasively argues that, at least in the context of the '723 Patent, only a human has a "voice." This is consistent with claim language that refers to receiving natural voice commands from a "user." *See* '723 Patent at Cls. 1, 22 & 42.

This is also consistent with disclosures that the system can recognize an "extensive" set of "speech commands" and that the commands are not limited to a pre-defined list but rather can be user-defined, such as commands to call a particular person:

> During a session on the web site, using text-to-speech, you could type in a name like "Harry Newton" and his phone number so that, when you eventually use the system the phone [*sic*] and you say, "call Harry Newton at the office," the system will recognize the name and dial the number you keyed in previously. Based on what you input now ("Harry Newton") is what the system utters later and *compares the phonemes of what you input now to what you'll be speaking later*.
>
> * * *
>
> The system combines state-of-the-art speech recognition, computer and telephony technology[, a]long with the ability to recognize an *extensive* set of simple, intuitive, speaker-independent speech *commands* and respond by performing a wide variety of complex *tasks*.

'723 Patent at 5:47–55 & 6:24–28 (emphasis added).

Defendants argue that if the term "natural voice commands" is not limited to specific words or phrases, then an inconsistency would arise in dependent Claim 2. Claims 1 and 2 of the '723 Patent recite (emphasis added):

> 1. A voice-enabled system for managing communications transmitted through a network, said system capable of receiving *natural voice commands* from a user, said system comprising:
>
> a computer;
>
> at least one set of stored commands operatively associated with said computer, each said set including a plurality of stored commands each of said commands in said set corresponding to a single voice-enabled function for managing communications, each said command in said set being an alternative intuitive description of said single voice-enabled function;
>
> a voice server operatively connected to said computer and to said network, said voice server configured to compare said *natural voice commands* to said plurality of stored commands;
>
> a speaker-independent speech recognition device operatively connected to said voice server, said device configured to receive at least one *natural voice command*, said voice server being configured to compare said *natural voice command* to said plurality of stored commands to select said single voice-enabled function, and said computer being configured to execute said selected voice-enabled function corresponding to said *natural voice command*.

2. The system of claim 1 wherein said at least one *natural voice command* is selected from the group consisting of: "transfer to the operator," "transfer to operator," "dial an extension," "dial extension," "reach an extension," "reach extension," "reach my party," "reach party," "reach him," "reach her," "reach them," "leave a message," "leave message," "open my mailbox," "open mailbox," "cancel," "listen to my messages," "listen to messages," "make a call," "make a telephone call," "make a phone call" "dial a telephone number," "dial a phone number," "transfer my calls," "transfer my calls to my office," "transfer my calls to my home," "transfer my calls to my mobile," "transfer my calls to my cell phone," "transfer my calls to my cellular phone," "transfer calls to my voice mail," "transfer calls to my office," "transfer my calls to my current number," "transfer my calls," "transfer calls," "transfer calls to my office," "transfer calls to my home," "transfer calls to my mobile," "transfer calls to my cell phone," "transfer calls to my cellular phone," "transfer calls to my voice mail," "transfer calls to my current number," "follow me," "set message notification," "notify me by email," "notify me by pager number," "notify me by pager," "notify me by voice thru email," "notify by email," "notify by pager number," "notify by pager," "notify by voice thru email," "turn notification off," "repeat the message," "repeat this message," "repeat message," "listen to the next message," "listen to next message," "the next message," "next message," "play caller id," "what is the caller id,"[] "what is caller id," "delete this message," "delete the message," "delete message," "save this message," "save the message," "save message," "return the call," "forward this message," "forward the message," "forward message," "create a contact," "create contact," "add a contact," "add this contact," "add contact," "go to the subscriber menu," "go to subscriber menu," "re-record this message," "re-record the message," "re-record message," "send this message," "send the message," "send message," "call (insert contact name)," "call (insert contact name) at home," "call (insert contact name) at office," "call (insert contact name) at work," "call home," "call the office," "call my office," "call office," "dial a number," "dial number," "use this recording," "use the recording," "use recording," "listen to this recording," "listen to the recording," "listen to recording," "re-record this name," "re-record the name," "re-record name," "set up conference call," "join the conference," and "join conference."

Defendants argue that Plaintiff's interpretation of "natural voice commands" gives rise to inconsistency in dependent Claim 2 because "[i]f the natural voice command is not limited to specific words or phrases, then it cannot be selected from a closed group of pre-selected words of [*sic*, or] phrases as a matter of logic." Dkt. No. 137 at 14.

No inconsistency is apparent, however, because dependent Claim 2 merely specifies various commands that could be received from a user by way of speaker-independent speech

recognition. The patentee specifying a set of examples in dependent Claim 2 does not warrant limiting the phrase "natural voice commands" in Claim 1 to a pre-defined list.

Defendants also cite Plaintiff's statement in reexamination that "mere spoken words cannot equate to natural voice commands." Dkt. No. 136, Ex. O, Response in Ex Parte Reexamination at 17. Defendants argue that Plaintiff's current proposal of "speech freely spoken by a user" is inconsistent with this prior statement, but in the next sentence Plaintiff explained further that "[n]atural voice commands are phoneme-based commands that are not based on patterns," and Plaintiff cited disclosure in the '723 Patent that "the system does not have to be trained to identify your voice." Dkt. No. 136, Ex. O, Response in Ex Parte Reexamination at 17. Plaintiff thus explained that "natural voice commands" are not stored voice patterns. That is, a received "natural voice command" need not be compared to a stored pattern of a particular person's voice. Instead, the phonemes contained in a received command are recognized in a speaker-independent manner.

Finally, Defendant argues that "[t]he examiner's construction of 'natural voice command' reads out the 'set of stored commands' and eliminates the comparison between the natural voice command and the set of stored commands, in effect, allows the natural voice command to directly select the voice-enabled function as originally claimed (and rejected)." Dkt. No. 137 at 15. Defendants' argument is unavailing because the claim recites that a particular "function" is associated with a "set" of stored "commands," such that many different commands could be used to execute a particular function. Thus, the received voice command is compared to a set of stored commands that, in turn, are associated with a particular function. Further, as discussed above, the stored commands need not all be pre-defined but rather can include user-defined commands.

The Court therefore hereby construes **"natural voice commands"** to mean **"words or phrases spoken by a human that correspond to a function, wherein more than one word or phrase can correspond to a particular function."**

**C. "[at least one] set of stored commands"**

| **"[at least one] set of stored commands"**<br>(Claims 1, 17–18, 22, 31–34, 42–44) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain and ordinary meaning: "a set of stored words or phrases" | "a predefined group of individual words or phrases"[6] |

Dkt. No. 91 at 2; Dkt. No. 107 at 19; Dkt. No. 109 at 21; Dkt. No. 113 at 3.

Shortly before the start of the February 26, 2024 hearing, the Court provided the parties with the following preliminary construction: "'a set of stored words or phrases' [Note: rejecting 'predefined']."

(1) The Parties' Positions

Plaintiff argues that Defendants' proposal of "predefined" should be rejected because "the '723 patent specification does not disclose a requirement that stored commands be 'predefined.'" Dkt. No. 107 at 20. Plaintiff argues that the specification discloses that stored commands can be updated by the user. *Id.* (citations omitted).

Defendants respond:

> If the "stored commands" in the "set of stored command" were not already predefined at the time of the comparison, then the claims would not make sense as a matter of plain English, because there would be nothing to compare. A person of ordinary skill in the art would have also understood that the stored commands, being operatively associated with the computer, would have had to be predefined

[6] Defendants previously proposed: "a predefined group of words or phrases" (Dkt. No. 109 at 21) and "a set of predefined words or phrases" (Dkt. No. 113 at 3).

> prior to the comparison in order for the stored command to be an input into the claimed comparison.

Dkt. No. 109 at 22 (citation omitted). Defendants also argue that "[a] person of ordinary skill [in the] art would have also understood that [the] ordinary and customary meaning of 'store' requires the stored entity to be defined prior to storage." *Id.* at 23 (citation omitted). Further, Defendants argue that "[r]egardless of whether the stored commands are hardcoded (which Parus concedes is pre-defined) or updatable by the user, they are already pre-defined prior to its comparison with the natural voice command." *Id.* at 23. Defendants urge that "far from being a vague cloud of loosely-associated terms, 'the set of stored commands' is a set of discrete commands." *Id.* at 24.

Plaintiff replies:

> The parties' dispute is limited to whether the construction should be the plain and ordinary meaning of "stored" (Parus's construction) or whether the Court should instead replace "stored" with the term "predefined," a term that does not equate to the term "stored" (Defendants' proposal). The Court should reject Defendants' proposed re-writing of the claims. *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1364 (Fed. Cir. 1999).

Dkt. No. 111 at 3.

At the February 26, 2024 hearing, the parties presented no oral arguments as to this term.

<u>(2) Analysis</u>

Claim 42, for example, recites (emphasis added):

> 42. A voice-enabled system for managing communications transmitted through a network, said system capable of receiving natural voice commands from a user, said system comprising:
>
> a computer;
>
> *at least one set of stored commands* operatively associated with said computer, each *said set including a plurality of stored commands* each of said commands in said set corresponding to a single voice-enabled function for managing communications, each said command in said set being an alternative intuitive description of said single voice-enabled function;

> a voice server operatively connect[ed] to said computer and to said network, said voice server configured to compare said natural voice commands to said plurality of stored commands;
>
> a speaker-independent speech recognition device operatively connected to said voice server, said device configured to receive at least one natural voice command, said voice command comprising said voice-enabled function and a tag, said tag associated with contact information stored in a database, said database associated with said computer, said voice server being configured to compare said natural voice command to said plurality of stored commands to select said single voice-enabled function, and said computer being configured to execute said selected voice-enabled function corresponding to said natural voice command.

On its face, nothing in the claim suggests that the word "stored" should be interpreted to be limited to "predefined." Whereas "predefined" could connote that a command is immutable, "stored" is a more general term that does not preclude modification. Defendants highlight the recital of "*each* of said commands in said set," arguing that the word "each" indicates that the commands must be "discrete and quantifiable" (Dkt. No. 109 at 24), but Defendants do not demonstrate that a command must be "predefined" in order to exist. The specification is consistent with this interpretation of "stored," disclosing for example that contact lists can be edited:

> During a session on the web site, using text-to-speech, you could type in a name like "Harry Newton" and his phone number so that, when you eventually use the system the phone [*sic*] and you say, "call Harry Newton at the office," the system will recognize the name and dial the number you keyed in previously. Based on what you input now ("Harry Newton") is what the system utters later and compares the phonemes of what you input now to what you'll be speaking later.
>
> * * *
>
> Subscribers can use voice commands to ([i]) build, edit and manage their contact lists, (ii) review, play back, read, reply to and/or reroute voice mail and e-mail, (iii) schedule conference calls with 800 number access, and (iv) maintain an itemized calling log listing all calls with a running total of all charges.

'723 Patent at 5:47–55 & 6:31–36.

During prosecution, the patentee distinguished the "Bareis" reference (United States Patent No. 5,659,597), arguing:

> One feature of the claimed invention in claims 13–56 is that a *set of voice commands*, each set including a plurality of voice commands each being an alternative intuitive description of a single voice-enabled function, may be used to execute the single voice-enabled function. *See* Specification, p. 11, ll. 25–28 ("Along with the ability to recognize an extensive set of simple, intuitive, speaker-independent speech commands and respond by performing a wide variety of complex tasks.") (emphasis added). In other words, a user does not have to utter one specific word or phrase in order to carry out a certain function but rather may utter any one of a plurality of commands that are intuitive of the desired function. The system has been configured to *understand and accept a multitude of commands for each voice-enabled function*, each command being intuitive of one desired function.
>
> For example, to make a telephone call, the user may utter one of many commands intuitive of the function of making a telephone call, such as "MAKE A PHONE CALL," "MAKE A TELEPHONE CALL," "DIAL A PHONE CALL," "DIAL A TELEPHONE CALL," "DIAL A NUMBER," "DIAL (name, location, or number)," "CALL (name, location, or number)," or "CONTACT (name, location, or number)." *See* Figs. 4C-1 & 4I (illustrating the "Make Call" menus).
>
> Independent claims 13, 33, 41, and 48 have been amended to emphasize this important feature.

Dkt. No. 107, Ex. B, May 16, 2007 Amendment and Reply Under 37 CFR 1.114 at 13 (emphasis modified).

Defendants argue that "[i]n order to 'store' a command, it must necessarily be predefined." (Dkt. No. 109 at 22.) Defendants do not persuasively demonstrate that a command must be "predefined" in order to be "stored," particularly to the extent that "predefined" connotes immutability. The opinion of Defendants' expert in this regard is unpersuasive. Dkt. No. 109, Ex. 1, July 20, 2022 Zatkovich Decl. at ¶ 63. Defendants' expert's opinions regarding source code submitted with a provisional patent application are likewise unpersuasive. *Id.* at ¶¶ 64–68.

Defendants also argue that the stored commands must be predefined because otherwise the system could not compare the natural voice commands to the plurality of stored commands as recited in the claims. Dkt. No. 109, Ex. 1, July 20, 2022 Zatkovich Decl. at ¶ 63 ("[I]f the 'stored commands' were not predefined . . ., then there would be nothing to compare."); *see id.* at ¶¶ 58 & 62–63. Comparing two things presumably requires that the two things exist, but this does not warrant requiring both things to be "predefined." In other words, Defendants do not demonstrate that a command must be "predefined" in order to exist.

The Court therefore hereby construes **"[at least one] set of stored commands"** to mean **"a set of stored words or phrases."**

**D. "[alternative] intuitive description"**

| **"[alternative] intuitive description"**<br>(Claims 1, 22, 42) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain and ordinary meaning | Indefinite, 35 U.S.C. § 112 |

Dkt. No. 91 at 2; Dkt. No. 107 at 21; Dkt. No. 109 at 6; Dkt. No. 113 at 3; Dkt. No. 135 at 2.

Shortly before the start of the February 26, 2024 hearing, the Court provided the parties with the following preliminary construction: "each said command in said set has not been provided to the user and is one of a plurality of alternative descriptions of said single voice-enabled function."

<u>(1) The Parties' Positions</u>

Plaintiff argues that this term is not indefinite because there is nothing subjective about the word "intuitive" in the context of this patent. Dkt. No. 107 at 23.

Defendants respond that this term is indefinite because "intuitive" "is a subjective term of degree for which neither the intrinsic record nor the extrinsic record provides sufficient objective guideposts as to the term's scope." Dkt. No. 109 at 6. Defendants argue that "[t]he examples for 'intuitive' in the intrinsic record fail to provide objective boundaries to a skilled artisan because they are incomplete examples for the recited claim language." *Id.* at 8. Defendants also argue that "[t]he examples for 'intuitive' in the intrinsic record also fail because they only apply to the telecommunications management domain," and "those limited examples provide no help to a skilled artisan in the much different domain of financial institution IVR [(Interactive Voice Response)] systems that Parus now accuses of infringement." *Id.* at 9 (citations omitted). Defendants further argue:

> [A]ccording to Parus, the user speaks a "natural voice command," that is compared to the "set of stored commands," and if there is a match, then the "natural voice command" was intuitive of the function corresponding to that set of stored commands. . . . Parus's thought process *assumes* that each of the stored commands is "intuitive" of the function, and thus if there is a match to the spoken "natural voice command" then the "natural voice command" was "intuitive" of the function. That is not what the claim requires, and it effectively deletes "intuitive" as a descriptor of the commands in the "set of stored commands."

*Id.* at 9–10.

Plaintiff replies that "intuitive" is not a subjective term of degree:

> Defendants' expert agrees with Parus that the '723 patent uses the term "intuitive" consistent with its plain and ordinary meaning, as set forth in Webster's New World College Dictionary (3rd Ed. 1997) (Dkt. 107-6): "the direct knowing or learning of something without the conscious use of reasoning; immediate understanding." (Dkt. 107 at 22; Dkt. 109-2 at ¶ 82).

Dkt. No. 111 at 3–4. For example, Plaintiff argues that "[t]he voice command 'CALL' does *not* have a different meaning to different people based on any particular person 'knowing it when you see it' or having a 'gut reaction,' as Defendants' expert incorrectly surmises." *Id.* at 4. Plaintiff also argues that "the intrinsic '723 patent record provides objective boundaries by which

a person skilled in the art could determine the scope of the claims with reasonable certainty," such as "intuitive, *speaker-independent* speech commands." *Id.* at 5 (quoting '723 Patent at 6:24–28) (emphasis Plaintiff's). Plaintiff also cites the prosecution history. *Id.* at 6–8. Further, Plaintiff argues:

> [I]n the claims, the intuitive commands of a particular function are specified by the person who stores the commands, not the user who later speaks the commands. In other words, if the person who stores the commands stored three alternative, intuitive commands for the function of making a telephone call, i.e., "CALL," "CONTACT," and "REACH," then, in response to a user who speaks the command "CALL," the system would understand that the user's command matched one of the stored, alternative, intuitive commands for the function of making a telephone call.

*Id.* at 7. Plaintiff submits that "an intuitive voice command is a voice command that can be spoken without having to be memorized or read from a listing of commands . . . ." *Id.* at 8.

In supplemental briefing, Plaintiff argues that the reexamination proceedings reinforce that this term is not indefinite because "no one involved with the '723 patent Reexamination . . . expressed any uncertainty as to the scope of the term '[alternative] intuitive description' or encounter[ed] any apparent difficulty in applying the term to the references." Dkt. No. 136 at 13.

Defendants respond that "[w]ith no guidance from the proffered dictionary definition, claims, specification, or the reexamination, whether or not a 'description' is 'intuitive' depends purely on the user's opinion on what is intuitive, rendering it indefinite under § 112." Dkt. No. 137 at 12.

Plaintiff replies that "[h]ere, like *Sonix*, the term '[alternate] intuitive description' is not a purely subjective term and the Reexam Panel's knowing confirmation of the validity of the claims of the '723 [Patent], together with the acceptance of the term by Defendants' reexamination expert, Mr. Polster, should compel this Court to the conclusion that the term '[alternative] intuitive description' is not indefinite." Dkt. No. 138 at 6.

At the February 26, 2024 hearing, Plaintiff argued an "alternative intuitive description" could be anything that a user would understand as a command for a function, which Plaintiff argued is not subjective but rather relies upon the common innate understanding of users.

(2) Analysis

As a threshold matter, the reexamination proceedings do not significantly affect the Court's analysis. Plaintiff argues that "neither Defendants nor the examiner had any difficulty determining the scope of 'intuitive' in the reexamination" (Dkt. No. 111 at 8; *see* Dkt. No. 136 at 13), but this does not significantly affect the Court's analysis, particularly when considering that a presumption of validity already applies to these issued patent claims. *See id.* at 1 & 8; *see also id.* at Exs. F & G.

In denying cross-motions for summary judgment regarding patent eligibility under 35 U.S.C. § 101, the Court found:

> With no guidance from the specification as to how to determine when a command is "an alternative intuitive description" of the single voice-enabled function, the Court is left to conclude that the claim language provides only a result-oriented solution with insufficient detail for how a computer accomplishes it, which is insufficient to escape characterization as an abstract idea. The Court finds that rather than focusing on a specific means or method that improves the relevant technology, claim 1 is directed to a result or effect that itself is the abstract idea and merely invokes generic processes and machinery.

Dkt. No. 119, Oct. 25, 2022 Order at 12 (citations omitted). Finding that the term "alternative intuitive description" relates to an abstract idea, however, does necessarily preclude a person of ordinary skill in the art from understanding the scope of "each said command in said set being an alternative intuitive description of said single voice-enabled function," for example, in Claims 1, 22, and 42.

Claim 1, for example, recites (emphasis added):

> 1. A voice-enabled system for managing communications transmitted through a network, said system capable of receiving natural voice commands from a user, said system comprising:
>
> a computer;
>
> at least one set of stored commands operatively associated with said computer, each said set including a plurality of stored commands each of said commands in said set corresponding to a single voice-enabled function for managing communications, each said command in said set being an *alternative intuitive description* of said single voice-enabled function;
>
> a voice server operatively connected to said computer and to said network, said voice server configured to compare said natural voice commands to said plurality of stored commands;
>
> a speaker-independent speech recognition device operatively connected to said voice server, said device configured to receive at least one natural voice command, said voice server being configured to compare said natural voice command to said plurality of stored commands to select said single voice-enabled function, and said computer being configured to execute said selected voice-enabled function corresponding to said natural voice command.

Although the parties present only "intuitive description" or "alternative intuitive description" as the terms for construction, construing the larger phrase "each said command in said set being an alternative intuitive description of said single voice-enabled function" is more appropriate so as to provide context for the meaning of "intuitive," as discussed herein.

The specification discloses:

> The present invention is a unified messaging service which will be accessible from any standard communication device (telephone, computer or internet), and will give the user intuitive voice command of personal, professional and public information.
>
> * * *
>
> The system combines state-of-the-art speech recognition, computer and telephony technology. Along with the ability to recognize an extensive set of simple, *intuitive*, speaker-independent speech commands and respond by performing a wide variety of complex tasks.

'723 Patent at 2:33–38 & 6:26–28 (emphasis added).

The patentee added the phrase "intuitive description" to the claims during prosecution. Dkt. No. 107, Ex. C, Aug. 21, 2006 Amendment at 2, 6 & 8. The patentee stated that "the voice

commands are an intuitive description of the desired voice-enabled functions," "[i]n other words, a user does not have to utter one specific word or phrase in order to carry out a certain function but rather may utter any command that is an *intuitive description* of the desired function." *Id.* at 12 (emphasis added).

During prosecution, the patentee asserted that whereas the "Bareis" reference "only recognizes the specific voice commands 'CALL,' 'DIAL,' 'DIRECTORY,' or 'QUIT,'" the claimed invention allows for a "multitude" of different commands that "intuitively describe the same function":

> One feature of the claimed invention in claims 13–56 is that a set of voice commands, each set including a plurality of voice commands each being an alternative *intuitive description* of a single voice-enabled function, may be used to execute the single voice-enabled function. *See* Specification, p. 11, ll. 25–28 ("Along with the ability to recognize an extensive set of simple, intuitive, speaker-independent speech commands and respond by performing a wide variety of complex tasks.") (emphasis added). In other words, a user does not have to utter one specific word or phrase in order to carry out a certain function but rather may utter any one of a plurality of commands that are *intuitive* of the desired function. The system has been configured to understand and accept a *multitude* of commands for each voice-enabled function, each command being *intuitive* of one desired function.
>
> For example, to make a telephone call, the user may utter one of many commands *intuitive* of the function of making a telephone call, such as "MAKE A PHONE CALL," "MAKE A TELEPHONE CALL," "DIAL A PHONE CALL," "DIAL A TELEPHONE CALL," "DIAL A NUMBER," "DIAL (name, location, or number)," "CALL (name, location, or number)," or "CONTACT (name, location, or number)." *See* Figs. 4C-1 & 4I (illustrating the "Make Call" menus).
>
> Independent claims 13, 33, 41, and 48 have been amended to emphasize this important feature.
>
> * * *
>
> [T]he system of the Bareis Patent only works with one specific voice command for a particular function and will not recognize other alternative commands that *intuitively* describe the same function.

> The system of the Bareis Patent only recognizes the specific voice commands "CALL," "DIAL," "DIRECTORY," or "QUIT," as described in the specification:
>
> * * *
>
> The system generates an error message if the user provides the system with a command other than "CALL," "DIAL," "DIRECTORY," or "QUIT," as described in the specification: * * *
>
> . . . In other words, if a user desires to make a telephone call, the system only will make the call if the user utters the specific command "CALL." The system will not work if the user utters the command "CONTACT" "MAKE A TELEPHONE CALL," or other commands that *intuitively* describe the desired function of making a call.
>
> The system disclosed in the Bareis Patent suffers from a severe deficiency because the user must have prior knowledge of the specific voice commands in order to interact with the system. In other words, users must memorize or have a listing of the limited commands which the system recognizes and cannot speak naturally with the system using one of a variety of commands which *intuitively* describes a desired voice-enabled function, as claimed in claims 13–56.

Dkt. No. 107, Ex. B, May 16, 2007 Amendment and Reply Under 37 CFR 1.114 at 13–15 (emphasis modified).

Defendants argue that "intuitive" is a term of degree that lacks objective boundaries and is therefore indefinite:

> For instance, a command like "CALL" may be considered highly intuitive or synonymous with a phone call function. Ex. 1 at ¶ 84. A command like "CONTACT" may be as well, though less so. *Id.* A command like "REACH" may be as well, though even less so. *Id.* And then there are even more distant commands like "GET" (e.g., "Get me Steve") or "WANT" (e.g., "I want Steve") that may or may not be considered intuitive or synonymous with a phone call function, depending on who you ask. *Id.*

Dkt. No. 109 at 7.

Defendants do not persuasively demonstrate that "intuitive" is a term of degree. Perhaps a term such as "highly intuitive" might be deemed a term of degree specifying a particular level of intuitiveness. *See, e.g., Advanced Display Techs. of Tex., LLC v. AU Optronics Corp.*, No.

6:11-CV-11, -391, 2012 WL 2872121, at *12 (E.D. Tex. July 12, 2012) (Davis, J.) ("The [patent-in-suit] . . . fails to provide a standard for measuring the difference between a mere modulated surface and a *highly* modulated surface."). Defendants' arguments regarding "intuitive," however, merely point to a potential factual dispute regarding what is "intuitive" and what is not "intuitive." The *Niazi* and *Interval Licensing* cases cited by Defendants, as to terms of degree, are therefore inapplicable. *See Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*, 30 F.4th 1339, 1349 (Fed. Cir. 2022) (quoting *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014)).

The meaning of "intuitive" is illuminated by the disclosure of "giv[ing] the user intuitive voice command of personal, professional and public information" and the disclosure of a "set of simple, intuitive, speaker-independent speech commands." '723 Patent at 2:33–38 & 6:26–28. And as discussed above, the prosecution history provides additional clarity by using the word "intuitively" in the context of a potential "multitude" of commands, such as "other commands that intuitively describe the desired function of making a call." *See* Dkt. No. 107, Ex. B, May 16, 2007 Amendment and Reply Under 37 CFR 1.114 at 13–15.

A fair reading of this intrinsic evidence is that the patentee used the term "alternative intuitive description" to refer to avoiding the need to memorize a specific list of commands (or to listen to a menu of specific commands) by claiming a system that can detect any of a set of commands that have *not* been provided to the user and that all trigger one particular function. This does not necessarily preclude *some* commands from being provided to the user. The claims here at issue require, however, that there must be a set of commands in which each command has not been provided to the user and each command is one of a plurality of alternative descriptions of a particular function.

Thus, reading the claim language in light of the specification, particularly when further read in light of this prosecution history, the scope of "intuitive" is reasonably clear. *See, e.g.*, *Niazi*, 30 F.4th at 1347 (discussing the finding in *Sonix* that "'visually negligible' [wa]s not a purely subjective term"). Also, Plaintiff notes that in the *Intellectual Ventures I* case cited by Defendants, the patent referred to the term there at issue ("QoS [(Quality of Service)] requirements") as being "defined by what network performance characteristic is most important to a particular user." *Intellectual Ventures I, LLC v. T-Mobile USA Inc.*, 902 F.3d 1372, 1381 (Fed. Cir. 2018). In the present case, by contrast, the context provided by the specification and the prosecution history, discussed above, demonstrates that "intuitive" is not a "value judgment that inherently varies from person to person" and does not involve a person's mental state. *Sonix*, 844 F.3d at 1378.

Further, although "intuitive" may not be a term of mathematical precision, the Supreme Court acknowledged in *Nautilus* that "absolute precision is unattainable." *Nautilus*, 134 S. Ct. at 2129.

Defendants have thus not met their burden to prove indefiniteness by clear and convincing evidence. *See Sonix*, 844 F.3d at 1377. Whether a particular command is "intuitive" is a question of fact for the finder of fact. *See Sonix*, 844 F.3d at 1378–81; *see also PPG*, 156 F.3d at 1355; *Acumed*, 483 F.3d at 806; *Eon*, 815 F.3d at 1318–19. This also comports with the specification and the claim language referring to commands being "speaker-independent." *See, e.g.,* '723 Patent at 6:26–28 & Cl. 1. The Court therefore hereby expressly rejects Defendants' indefiniteness arugment.

Finally, at the February 26, 2024 hearing, Defendants submitted that the Court's preliminary construction (which construes the larger term "each said command in said set being

an alternative intuitive description of said single voice-enabled function") does not expressly address the term "intuitive description" in the second limitation of Claim 22. Claim 22 recites (emphasis added):

> 22. A method of managing communications transmitted through a computer-based telephony system, said system including a speaker-independent speech recognition device, the method comprising the steps of:
>
> accessing said system;
>
> transmitting a prompt from said computer-based telephony system to a user, said prompt designed to elicit a natural voice command from said user, said command being an *intuitive description* of a desired voice-enabled function for at least one system communication;
>
> receiving a natural voice command from said user requesting execution of said at least one voice-enabled function;
>
> comparing said natural voice command to at least one set of stored commands operatively associated with said computer, each said set including a plurality of stored commands each of said commands in said set corresponding to a single voice-enabled function for managing communications, *each said command in said set being an alternative intuitive description of said single voice-enabled function*;
>
> selecting said single voice-enabled function corresponding to said natural voice command; and
>
> executing said voice-enabled function requested by said user natural voice command.

For the sake of clarity, the Court herein explicitly construes the phrase "said command being an intuitive description of a desired voice-enabled function," and the Court does so in a manner consistent with the Court's analysis as set forth above.

The Court accordingly hereby construes these disputed terms as set forth in the following chart:

| Term | Construction |
|---|---|
| **"each said command in said set being an alternative intuitive description of said single voice-enabled function"** | **"each said command in said set has not been provided to the user and is one of a plurality of alternative descriptions of said single voice-enabled function"** |

| | |
|---|---|
| **"said command being an intuitive description of a desired voice-enabled function"** | **"said command being a description that has not been provided to the user and that is a description of said single voice-enabled function"** |

**E. "voice server"**

| **"voice server"**<br>(Claims 1, 17–18, 34, 42–44) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| No construction necessary; plain and ordinary meaning | "a central computer accessible through a network that provides certain functions including telephony, automatic speech recognition, text-to-speech, and conferencing" |

Dkt. No. 91 at 3; Dkt. No. 107 at 24; Dkt. No. 109 at 24; Dkt. No. 113 at 4; Dkt. No. 135 at 3.

Shortly before the start of the February 26, 2024 hearing, the Court provided the parties with the following preliminary construction: "server that analyzes voice commands."

<u>(1) The Parties' Positions</u>

Plaintiff argues: "The requirements of the 'voice server' is defined by the claim itself: it is a server 'operatively connected to said computer and to said network' and 'configured to compare said natural voice commands to said plurality of stored commands.' No further construction is necessary beyond the definition already provided in the claim." Dkt. No. 107 at 24.

Defendants respond that "both the intrinsic record and the inventor's testimony demonstrate a clear intent to limit this term," and "Parus provides no evidence of a generally accepted plain and ordinary meaning and provides no argument that a 'voice server' is anything

beyond a device to perform the unitary function of comparing the natural voice commands with the set of stored commands." Dkt. No. 109 at 25–26.

Plaintiff replies:

> Defendants incorrectly contend that a plain and ordinary meaning construction of voice server *excludes* certain functions. That is, according to Defendants, a plain and ordinary meaning creates a negative limitation excluding "telephony, automatic speech recognition, text-to-speech, and conferencing." (Dkt. 109 at 25). An "unclaimed function" is not an "excluded" function; rather it is an "unrequired" function. Indeed, this is precisely what Kurganov stated in the specification: "[t]he voice server 12 includes *certain* functions, *such as* telephony, automatic speech recognition, text-to-speech, conferencing, *etc.*" ('723 patent, at 3:37–39; emphasis added). One function that the voice server is required to perform is stated in the claims: "compar[ing] said natural voice commands to said plurality of stored commands." ('723 patent, at 8:14–17; 13:13–16).

Dkt. No. 111 at 8–9.

At the February 26, 2024 hearing, the parties presented no oral arguments as to this term.

<u>(2) Analysis</u>

Claim 1, for example, recites (emphasis added):

> 1. A voice-enabled system for managing communications transmitted through a network, said system capable of receiving natural voice commands from a user, said system comprising:
>
> a computer;
>
> at least one set of stored commands operatively associated with said computer, each said set including a plurality of stored commands each of said commands in said set corresponding to a single voice-enabled function for managing communications, each said command in said set being an alternative intuitive description of said single voice-enabled function;
>
> a *voice server* operatively connected to said computer and to said network, said *voice server* configured to compare said natural voice commands to said plurality of stored commands;
>
> a speaker-independent speech recognition device operatively connected to said *voice server*, said device configured to receive at least one natural voice command, said *voice server* being configured to compare said natural voice command to said plurality of stored commands to select said single voice-enabled function, and said computer being configured to execute said selected voice-enabled function corresponding to said natural voice command.

In the context of this claim, the term "voice server" can be readily understood as a server that analyzes voice commands. The claim itself provides substantial context by reciting "said voice server configured to compare said natural voice commands to said plurality of stored commands." This also comports with how "server" is used in the context of other types of servers in the patent, such as the "file server," "database server" and "web server" recited in dependent Claims 7, 8, and 9.

Defendants' proposal of "a central computer" would exclude distributed or multi-computer servers, and Defendants provide no support for introducing such a limitation. Defendants' proposal of requiring that the "voice server" provides "certain functions including telephony, automatic speech recognition, text-to-speech, and conferencing" likewise lacks support. Although the specification discloses that "[t]he voice server 12 includes certain functions, such as telephony, automatic speech recognition, text-to-speech, conferencing, etc" ('723 Patent at 3:37–39), this disclosure is illustrative, not definitional, and these specific features should not be imported into the claims. *See Phillips*, 415 F.3d at 1323.

The statements by the named inventor cited by Defendants, even if considered, do not compel otherwise. Dkt. No. 109, Ex. 8, Feb. 12, 2015 Kurganov Decl. at ¶¶ 12–13 (patents "disclose and claim voice servers that include certain functions such as telephony, speech recognition, text to speech and conferencing"; "[t]hose telephony functions can be triggered by speech commands"); *see Howmedica*, 540 F.3d at 1347 ("inventor testimony as to the inventor's subjective intent is irrelevant to the issue of claim construction").

The Court therefore hereby construes **"voice server"** to mean **"server that analyzes voice commands."**

**F. "tag"**

| **"tag"** (Claims 31–33, 42–44) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| "a label associated with a set of data" | "a label that identifies a record and its storage location in another file"<br><br>Alternatively, Defendants have offered to accept Parus's originally proposed construction of this term:<br>"one or more characters associated with a set of data, containing information about the set" |

Dkt. No. 91 at 3; Dkt. No. 107 at 25; Dkt. No. 109 at 26; Dkt. No. 113 at 6–7; Dkt. No. 135 at 3.

Shortly before the start of the February 26, 2024 hearing, the Court provided the parties with the following preliminary construction: "label that identifies data."

(1) The Parties' Positions

Plaintiff argues that Defendants' proposal should be rejected because "[t]here is no support in the intrinsic record for the 'storage location in another file' limitation; the claims refer to the tag being 'associated with contact information stored in a database,' but say nothing about identifying a 'storage location,' or 'another file.'" Dkt. No. 107 at 26.

Defendants respond that "Parus's original construction and Defendants' proposed construction share the same basic elements that are consistent with how 'tag' is used in claims 31 and 42: (a) an 'identifier,' i.e., 'one or more characters' or 'a label'; (b) stored contact information, i.e., set of data or a record[]; and (c) the identifier is 'linked' to the stored contact information in a database in some way." Dkt. No. 109 at 27.

Plaintiff replies that "[t]he claims do not state (or require) that the 'tag' be a label 'that identifies a record and its storage location in another file,' as Defendants propose, or that the 'tag' be a label that 'contain[s] information about the [set of data]' . . . ." Dkt. No. 111 at 9.

At the February 26, 2024 hearing, the parties presented no oral arguments as to this term.

(2) Analysis

Claim 42, for example, recites (emphasis added):

> 42. A voice-enabled system for managing communications transmitted through a network, said system capable of receiving natural voice commands from a user, said system comprising:
>
> a computer;
>
> at least one set of stored commands operatively associated with said computer, each said set including a plurality of stored commands each of said commands in said set corresponding to a single voice-enabled function for managing communications, each said command in said set being an alternative intuitive description of said single voice-enabled function;
>
> a voice server operatively connect[ed] to said computer and to said network, said voice server configured to compare said natural voice commands to said plurality of stored commands;
>
> a speaker-independent speech recognition device operatively connected to said voice server, said device configured to receive at least one natural voice command, said voice command comprising said voice-enabled function and a *tag*, said *tag* associated with contact information stored in a database, said database associated with said computer, said voice server being configured to compare said natural voice command to said plurality of stored commands to select said single voice-enabled function, and said computer being configured to execute said selected voice-enabled function corresponding to said natural voice command.

The specification discloses, for example:

> [Y]ou could type in a name like "Harry Newton" and his phone number so that, when you eventually use the system the phone [*sic*] and you say, "call Harry Newton at the office," the system will recognize the name and dial the number you keyed in previously.

'723 Patent at 5:47–52.

During prosecution, in a section of the Remarks that the patentee titled "Voice Commands Comprise a Desired Voice-Enabled Function and a Tag," the patentee used the term "tag" as follows:

> Another feature of the claimed invention in claims 48–56 is that the voice commands comprise a desired voice-enabled function and a *tag*, which is associated with contact information such as the name and/or location of a person or business and is used by the system to carry out the voice-enabled function. *See, e.g.,* Specification, p. 10, 11. 15–16; *see also* Fig. 4I. For example, a user may provide the voice command "CALL HARRY NEWTON AT THE OFFICE." In response, the system identifies "CALL" as the voice-enabled function and "HARRY NEWTON AT THE OFFICE" as the *tag*. Then, the system searches the user's contact information to determine the office telephone number for Harry Newton. After retrieving Harry Newton's office telephone number, the system calls the number for the user. As another example, as shown in Fig. 4I, a user may provide the voice command "CALL HOME," which comprises the voice-enabled function "CALL" and the *tag* "HOME." In response to this command, the system searches the user's contact information to retrieve the user's home telephone number, which it then dials for the user.

Dkt. No. 107, Ex. C, Aug. 21, 2006 Amendment at 16 (emphasis added).

This prosecution history demonstrates that a "tag" is a label that identifies a data record. Defendants' proposed construction is appropriate in that regard. This is also consistent with a technical dictionary definition (discussed by both Plaintiff and Defendants) of "tag" in the context of "data management" as meaning "[o]ne or more characters associated with a set of data, containing information about the set." Dkt. No. 109, Ex. 5, *IEEE Standard Dictionary of Electrical and Electronics Terms* (6th ed. 1996) (PARUS_513477).

Defendants do not, however, adequately support their proposal that a "tag" must identify not only a data record but also "its storage location in another file." Defendants argue that a tag necessarily must identify where the data is so that it can be located, and Defendants cite a decision by the Court of Appeals for the Federal Circuit that discussed "XML tags" (finding a lack of patentable subject matter under 35 U.S.C. § 101). Dkt. No. 109 at 27 (citing *Intellectual*

*Ventures I LLC v. Erie Indem. Co.*, 850 F.3d 1315, 1327 (Fed. Cir. 2017)). Even assuming that this discussion of a term in a different patent is relevant here, this discussion of "tags" and "XML tags" in the context of 35 U.S.C. § 101 does not demonstrate that "tag" as used in the '723 Patent necessarily refers to a storage location. *See id.*

The Court therefore hereby construes **"tag"** to mean **"label that identifies data."**

**G. "said voice command comprises said voice-enabled function and a tag"**

| **"said voice command comprises said voice-enabled function and a tag"** (Claims 31, 42–44) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| *See* definition of "tag."<br><br>Plain and ordinary meaning as to the remaining terms. | Indefinite, 35 U.S.C. § 112 |

Dkt. No. 91 at 3; Dkt. No. 107 at 26; Dkt. No. 109 at 11; Dkt. No. 113 at 7; Dkt. No. 135 at 3.

Shortly before the start of the February 26, 2024 hearing, the Court provided the parties with the following preliminary construction: "said voice command identifies said voice-enabled function and a tag."

<u>(1) The Parties' Positions</u>

Plaintiff argues that this term is not indefinite because "inventor Kurganov plainly described during prosecution, through two examples, what is meant by the claim phrase 'said voice command comprises said voice-enabled function and a tag,'" and "[m]oreover, the parties have provided proposed constructions for 'natural voice command' and 'tag.'" Dkt. No. 107 at 27.

Defendants respond:

> This term is indefinite because it is irresolvably inconsistent with the use of "voice-enabled function" elsewhere in the claims. While this term recites that a "voice command *comprises* said voice-enabled function," the claims elsewhere describe "voice-enabled function" as a computer functionality. * * *
>
> A person of ordinary skill in the art would not be able to reconcile the fact that a "voice-enabled function" is computer functionality executed by a computer, with this term's recitation that the "voice command *comprises* said voice-enabled function." This would require that spoken words include computer functionality, which would be irresolvably contradictory to a person of skill in the art.

Dkt. No. 109 at 11–12 (citations omitted). Defendants also argue that "Parus turns to the prosecution history as allegedly informing definite meaning of this term, but in doing so, actually demonstrates that this term was rendered indefinite by the addition of 'set of stored commands' to the claims later in prosecution." *Id.* at 12. Defendants argue that "the prosecution history relied on by Parus, irresolvably contradictory even when originally made, became even further so upon the later restructuring of the claims to add the new 'set of stored commands' entity." *Id.* at 13.

Plaintiff replies that "[a] person of ordinary skill in the art, when reading Kurganov's [(the named inventor's)] explanation [during prosecution], would have understood that the 'voice command comprises said voice-enabled function' means the voice command includes an identification of a voice-enabled function." Dkt. No. 111 at 10. Plaintiff argues:

> This is even more evident after Kurganov amended the claims to add the "set of stored commands," because, as amended, the claims state that "each [stored] command in said set being an alternative intuitive description of said voice-enabled function." ('723 patent, at 8:11–13; 10:28–30; and 13:10–12). A "description of" is another way of saying "a name for."

*Id.*

At the February 26, 2024 hearing, the parties presented no oral arguments as to this term.

(2) Analysis

Claim 42, for example, recites (emphasis added):

> 42. A voice-enabled system for managing communications transmitted through a network, said system capable of receiving natural voice commands from a user, said system comprising:
>
> a computer;
>
> at least one set of stored commands operatively associated with said computer, each said set including a plurality of stored commands each of said commands in said set corresponding to a single voice-enabled function for managing communications, each said command in said set being an alternative intuitive description of said single voice-enabled function;
>
> a voice server operatively connect [*sic*, connected] to said computer and to said network, said voice server configured to compare said natural voice commands to said plurality of stored commands;
>
> a speaker-independent speech recognition device operatively connected to said voice server, said device configured to receive at least one natural voice command, *said voice command comprising said voice-enabled function and a tag*, said tag associated with contact information stored in a database, said database associated with said computer, said voice server being configured to compare said natural voice command to said plurality of stored commands to select said single voice-enabled function, and said computer being configured to execute said selected voice-enabled function corresponding to said natural voice command.

Defendants argue that this disputed term (which refers to a voice command comprising a "voice-enabled function" and a tag) is inconsistent with other claim language reciting that a "voice-enabled function" is a computer function for managing communications. *See* '723 Patent at Cl. 1 ("said computer being configured to execute said selected voice-enabled function"). More specifically, Defendants argue:

> A person of ordinary skill in the art would not be able to reconcile the fact that a "voice-enabled function" is computer functionality executed by a computer, with this term's recitation that the "voice command *comprises* said voice-enabled function." Ex. 1[, July 20, 2022 Zatkovich Decl.] at ¶ 91. This would require that spoken words include computer functionality, which would be irresolvably contradictory to a person of skill in the art. *Id.*

Dkt. No. 109 at 12.

A fair reading of this claim language, however, is that "said voice command" does not itself contain a computer function but rather "comprises" a computer function in the sense that the voice command *identifies* a computer function. This is also consistent with prosecution

history in which the patentee stated: "For example, a user may provide the voice command 'CALL HARRY NEWTON AT THE OFFICE.' In response, the system identifies 'CALL' as the voice-enabled function and 'HARRY NEWTON AT THE OFFICE' as the tag." Dkt. No. 107, Ex. C, Aug. 21, 2006 Amendment at 16.

Further, this is consistent with the recital elsewhere in the claim of "at least one set of stored commands" wherein each command is "an alternative intuitive *description* of said single voice-enabled function." '723 Patent, Cl. 42 (emphasis added). Defendants cite subsequent prosecution history in which the patentee did not discuss "said voice command comprising said voice-enabled function and a tag," but Defendants do not persuasively show any indefiniteness arising from the patentee's silence regarding this term. *See* Dkt. No. 107, Ex. B, May 16, 2007 Amendment and Reply Under 37 CFR 1.114 at 2–12 (amending claims, adding "stored commands" and "voice server").

Defendants' indefiniteness argument, and the indefiniteness opinions of Defendants' expert, are therefore unpersuasive. *See* Dkt. No. 109, Ex. 1, July 20, 2022 Zatkovich Decl. at ¶¶ 87–94.

The Court therefore hereby construes **"said voice command comprises said voice-enabled function and a tag"** to mean **"said voice command identifies said voice-enabled function and a tag."**

**H. "logic flow"**

| **"logic flow"**<br>(Claims 17, 18) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Not subject to 35 U.S.C. § 112 (f) | Subject to 35 U.S.C. § 112(f).<br><br>Function:<br>"transmitting said prompts to said user in a predetermined manner in response to said server accessing said system or said user providing a natural voice command"[7]<br><br>Structure:<br>'723 patent, 4:14–67, FIGS. 4A–4R |

Dkt. No. 91 at 3–4; Dkt. No. 107 at 28; Dkt. No. 109 at 28; Dkt. No. 113 at 4; Dkt. No. 135 at 3.

Shortly before the start of the February 26, 2024 hearing, the Court provided the parties with the following preliminary construction: "Means-plus-function term governed by 35 U.S.C. § 112, ¶ 6 / Function: 'transmitting said prompts to said user in a pre-determined manner in response to said user accessing said system or said user providing a natural voice command' / Corresponding Structure: 'a general-purpose processor configured to perform all of the algorithms disclosed in the '723 Patent at 4:14–67 & Figures 4A–4R'."

<u>(1) The Parties' Positions</u>

Plaintiff argues that the presumption against means-plus-function treatment for this non-means term has not been rebutted, and "a POSITA [(person of ordinary skill in the art)] would

[7] Defendants previously proposed: "transmitting prompts to a user in a pre-determined manner in response to a user accessing a system or a user providing a natural voice command." Dkt. No. 91 at 3–4.

have understood the term 'logic flow' to have a sufficiently definite meaning as the name for structure." Dkt. No. 107 at 29.

Defendants respond that "the '723 patent simply replaces the term 'means' with 'logic,' and then recites the functions performed by the 'logic,'" and "'logic' is a well-known nonce word that can operate as a substitute for 'means' and does not connote sufficiently definite structure." Dkt. No. 109 at 28. Defendants also argue that "[t]he suffix 'flow' similarly fails to impart structure; it is a descriptor that, at best, merely helps describe the logic's function." *Id.* at 29. Defendants further argue:

> A POSITA at the time may have recognized that the term "logic flow" may be generally used to refer to a process or algorithm for executing a software task, but would not have understood that term as referring to any particular structure. In the field of the invention, "logic" includes any programming of a computer, whether by software, hardware, firmware, etc. In fact, "logic" refers even more broadly to any definition of one or more decisions and consequent actions. "Logic" effectively covers the entire field of computing. When combined with "logic," the term "flow" would have communicated to a POSITA that there is a defined sequence of logic, e.g., one decision leads to another in a defined way. As with "logic," the term "logic flow" would cover any programming of a computer (software, hardware, firmware, etc.), as well as other specifications of decisions and consequent actions. A POSITA would have understood that "logic flow" was a placeholder for any computing means that performed the recited functions of claims 17 and 18, even though the claim language does not include the term "means," because there is no structure or class of structures that a POSITA would have associated with "logic flow."

*Id.* at 29–30 (citations omitted).

Plaintiff replies:

> Defendants' arguments demonstrate two things: (1) "logic flow" refers to the flow of prompts that follow depending on the user's commands; and (2) the flow of prompts that follow depending on the user's commands (i.e., a "logic flow") is a sufficient structure for performing the claimed functions ('723 patent, at 10:3–9). Because "logic flow" is a sufficient structure for performing the functions, it is not a means plus function claim term subject to Section 112, para. 6.

Dkt. No. 111 at 10.

At the February 26, 2024 hearing, the parties presented oral arguments as to this term.

(2) Analysis

Title 35 U.S.C. § 112(f) (formerly § 112, ¶ 6) provides: "An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." "In exchange for using this form of claiming, the patent specification must disclose with sufficient particularity the corresponding structure for performing the claimed function and clearly link that structure to the function." *Triton Tech of Tex., LLC v. Nintendo of Am., Inc.*, 753 F.3d 1375, 1378 (Fed. Cir. 2014).

"[T]he failure to use the word 'means' . . . creates a rebuttable presumption . . . that § 112, para. 6 does not apply." *Williamson v. Citrix Online LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015) (citations and internal quotation marks omitted). "When a claim term lacks the word 'means,' the presumption can be overcome and § 112, para. 6 will apply if the challenger demonstrates that the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." *Id.* at 1349 (citations and internal quotation marks omitted).

*Williamson*, in an en banc portion of the decision, abrogated prior statements that the absence of the word "means" gives rise to a "strong" presumption against means-plus-function treatment. *Id.* (citation omitted). *Williamson* also abrogated prior statements that this presumption "is not readily overcome" and that this presumption cannot be overcome "without a showing that the limitation essentially is devoid of anything that can be construed as structure." *Id.* (citations omitted). Instead, *Williamson* found, "[h]enceforth, we will apply the presumption

as we have done prior to *Lighting World* . . . ." *Id.* (citing *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1358 (Fed. Cir. 2004)). In a subsequent part of the decision not considered en banc, *Williamson* affirmed the district court's finding that the term "distributed learning control module" was a means-plus-function term that was indefinite because of lack of corresponding structure, and in doing so *Williamson* stated that "'module' is a well-known nonce word." 792 F.3d at 1350.

Here, Claims 17 and 18 depend from Claim 1. Claims 1, 17, and 18 recite (emphasis added):

> 1. *A voice-enabled system for managing communications transmitted through a network*, said system capable of receiving natural voice commands from a user, said system comprising:
>
> *a computer*;
>
> at least one set of stored commands operatively associated with said computer, each said set including a plurality of stored commands each of said commands in said set corresponding to a single voice-enabled function for managing communications, each said command in said set being an alternative intuitive description of said single voice-enabled function;
>
> a voice server operatively connected to said computer and to said network, said voice server configured to compare said natural voice commands to said plurality of stored commands;
>
> a speaker-independent speech recognition device operatively connected to said voice server, said device configured to receive at least one natural voice command, said voice server being configured to compare said natural voice command to said plurality of stored commands to select said single voice-enabled function, and said computer being configured to execute said selected voice-enabled function corresponding to said natural voice command.
>
> * * *
>
> 17. The system of claim 1 further comprising:
>
> a set of prompts audible to said user, and
>
> a *logic flow* for transmitting said prompts to said user in a pre-determined manner in response to said user accessing said system or said user providing a natural voice command.
>
> 18. The system of claim 17 wherein said *logic flow* provides for prompts depending on the response transmitted by the user to an earlier prompt.

On one hand, the "logic flow," in dependent Claims 17 and 18, is recited in the context of "[a] voice-enabled system for managing communications transmitted through a network" that includes a "computer" as recited in independent Claim 1. Plaintiff argues that, in this context of computer operations, the term "logic flow" connotes sufficient structure for performing the function of "transmitting said prompts to said user in a pre-determined manner in response to said user accessing said system or said user providing a natural voice command." Plaintiff also cites the flow charts set forth in the specification and the accompanying descriptions thereof. *See* '723 Patent at Figs. 4A–4R, *see also* '723 Patent at 4:14–67.

On the other hand, the recital of "a logic flow *for* transmitting . . ." is "in a format consistent with traditional means-plus-function claim limitations." *Williamson*, 792 F.3d at 1350. Unlike, for example, the term "detent mechanism" discussed by the Federal Circuit in *Greenberg*,[8] Plaintiff has not shown that the phrase "logic flow" refers to any well-known class of structures in the relevant art. Further, the Federal Circuit found a "logic" term to be a means-plus-function term in an analogous context in *Egenera, Inc. v. Cisco Sys., Inc.*, 972 F.3d 1367 (Fed. Cir. 2020). In *Egenera*, the claim recited "a plurality of computer processors connected to an internal communication network" and "at least one control node," "said at least one control node including *logic* to modify said received messages to transmit said modified messages to the external communication network and to the external storage network." *Id.* at 1370 (emphasis added). The Federal Circuit concluded that, "[a]s used, 'logic' is no more than a 'black box

[8] *See Greenberg v. Ethicon Endo-Surgery, Inc.*, 91 F.3d 1580, 1583 (Fed. Cir. 1996) (finding that "detent mechanism" was not a means-plus-function term because "'detent' denotes a type of device with a generally understood meaning in the mechanical arts, even though the definitions are expressed in functional terms"; "It is true that the term 'detent' does not call to mind a single well-defined structure, but the same could be said of other commonplace structural terms such as 'clamp' or 'container.' What is important is not simply that a 'detent' or 'detent mechanism' is defined in terms of what it does, but that the term, as the name for structure, has a reasonably well understood meaning in the art.")

recitation of structure' that is simply a generic substitute for 'means.'" *Id.* at 1375. The "logic flow" in the present case is analogous in this regard.

Finally, to the extent that Plaintiff relies upon the presence of structures in the specification as purportedly demonstrating that "logic flow" must connote structure, such reliance is unpersuasive. *See Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1296–97 (Fed. Cir. 2014) ("it is possible to find that a claim limitation does not connote sufficiently definite structure despite the presence of some corresponding structure in the specification") (citations omitted), *abrogated on other grounds by Williamson*, 792 F.3d 1339.

On balance, "logic flow" does not connote any particular class of structures, and Defendants have rebutted the presumption against means-plus-function treatment. *See id.*

As for the claimed function, the claim recites "a logic flow *for transmitting said prompts to said user in a pre-determined manner in response to said user accessing said system or said user providing a natural voice command*."

As for corresponding structure, Plaintiff presents no proposal, but Defendants propose referring to the same figures and written description that Plaintiff cites as to the above-discussed threshold issue of whether 35 U.S.C. § 112, ¶ 6 applies. *See* '723 Patent at Figs. 4A–4R, *see also id.* at 4:14–67. Finally, implicit in Defendants' proposal is that the "logic flow" is implemented as a general-purpose processor performing algorithms.

The Court therefore hereby finds that **"logic flow for transmitting said prompts to said user in a pre-determined manner in response to said user accessing said system or said user providing a natural voice command"** is a **means-plus-function term governed by 35 U.S.C. § 112, ¶ 6**, the claimed function is **"transmitting said prompts to said user in a pre-determined manner in response to said user accessing said system or said user providing a**

**natural voice command,"** and the corresponding structure is **"a general-purpose processor configured to perform all of the algorithms disclosed in the '723 Patent at 4:14–67 & Figures 4A–4R; and equivalents thereof."**

## V. CONCLUSION

The Court adopts the constructions set forth in this opinion for the disputed terms of the patent-in-suit.

The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury. Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

**SIGNED this 5th day of March, 2024.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE